UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| TALJ HOWARD, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | |
| | § | |
| CITY OF JENNINGS, LOUISIANA; EDUARDO | § | **COMPLAINT** |
| MENDOZA; CHRISTOPHER BERGEAUX; and | § | |
| DAVID AMRINE, | § | **JURY TRIAL DEMANDED** |
| | § | |
| *Defendants*. | § | |
| | § | |

COMES NOW, Plaintiff Talj Howard, by and through undersigned counsel, who alleges as follows based on information and belief, including information received in response to records requests submitted to the Jennings Police Department and the Welsh Police Department:

## **INTRODUCTION**

1.      This is a civil rights action that arises out of an unconstitutional and arbitrary traffic stop, subsequent illegal detention, and unreasonable search of plaintiff Talj Howard by defendants Eduardo Mendoza, Christopher Bergeaux, and David Amrine (the "Officer Defendants").

2.      Mr. Howard is a 41-year-old elementary- and middle-school art teacher from Newark, New Jersey. He is Black. On Thursday, April 8, 2021, during his school's spring break, Mr. Howard was driving east on Interstate 10 ("I-10") through Jennings, Louisiana, in a rented Nissan Sentra with Virginia license plates. At approximately 11:20 a.m. CDT, Mr. Howard was driving in the left lane, not speeding, keeping up with the traffic in front of him, and passing the slower-moving vehicles in the right lane. Nevertheless, Patrolman Eduardo Mendoza of the Jennings Police Department pulled him over, supposedly for improper use of the left lane.

3.     What followed bore no resemblance to a routine traffic stop.  Patrolman Mendoza did not approach Mr. Howard's vehicle.  Instead, he immediately ordered Mr. Howard out of his vehicle and onto the pavement.  Patrolman Mendoza then left his vehicle, approached Mr. Howard on the shoulder of the highway, briefly raised the left-lane issue as the purported reason for the stop, and went on to interrogate Mr. Howard about his home, his job, where he had been, and where he was going.  None of this had anything to do with driving in the left lane.

4.     From there, in broad daylight as motorists streamed by, Patrolman Mendoza, along with two other officers that he called to the scene as backup for the purported left-lane violation:

- Frisked Mr. Howard;

- Forbade him from retrieving his cell phone from his car;

- Ran computer searches to track his travels over the preceding days;

- Subjected his car to a canine inspection; and

- Searched the interior and trunk of his car, removing internal panels and unzipping his luggage to rifle through his clothes and personal effects.

5.     When Mr. Howard objected to the lack of probable cause for the search, Patrolman Mendoza called him "Mr. Street Lawyer" and suggested that probable cause might be relevant in New Jersey, but not in Louisiana.

6.     These intrusions turned up nothing illegal.

7.     Patrolman Mendoza finally allowed Mr. Howard to return to his car and leave the scene after an hour-long detention, during which Mr. Howard was left standing on the side of I-10 in near ninety-degree heat.  Patrolman Mendoza issued Mr. Howard a ticket for "illegally"

driving in the left lane, but the Jennings Police Department later dismissed the ticket after

Mr. Howard followed up to ask questions about the stop and detention.

8.      The right to be free from arbitrary traffic stops has been clearly established for

many decades.  A random traffic stop without articulable or reasonable suspicion that a violation

of law has occurred is constitutionally impermissible and violates the Fourth Amendment.[1]

Moreover, a traffic stop may not be performed based on an officer's mere hunch of illegal

activity[2] and may last no longer than is necessary to effectuate its purpose.[3]

9.      Mr. Howard brings this action seeking redress for the unlawful traffic stop, pat-

down, detention, and search, all in violation of the Fourth and Fourteenth Amendments to the

U.S. Constitution, and Article I, Section 5 of the Louisiana Constitution; the unlawful arrest in

violation of La. Rev. Stat. Ann. § 32:71; and the Jennings Police Department's negligent hiring

of Patrolman Mendoza and failure to properly supervise and discipline its officers.  Mr. Howard

also seeks a declaration that the Officer Defendants' conduct was illegal and unconstitutional so

that he will not have to suffer the same unreasonable intrusions again.

## PARTIES

10.      Plaintiff Talj Howard is a Black man who resides in New Jersey.  He is an

elementary- and middle-school art teacher, an aspiring stand-up comedian, and a part-time driver

for Uber.

11.      Defendant City of Jennings, Louisiana is a municipality in Jefferson Davis Parish,

and has been duly incorporated.  Defendant City of Jennings is a municipality for purposes of 42

U.S.C. § 1983 and has ultimate authority and/or responsibility to hire, fire, supervise, and

---

[1] *Delaware* v. *Prouse*, 440 U.S. 648, 663 (1979).
[2] *Id.* at 661.
[3] *Rodriguez v. United States*, 575 U.S. 348, 356-57 (2015).

establish and enforce the policies, procedures, customs, and practices governing the conduct of the officers of the Jennings Police Department, which is the municipal police force with law enforcement responsibilities within Jennings, Louisiana.  Defendant City of Jennings receives federal financial assistance, including, on information and belief, for law enforcement activities.

12.     Defendant Eduardo Mendoza was, at all relevant times herein, an officer with the Jennings Police Department acting and/or neglecting to act in the course and scope of his employment and under color of state law.  On information and belief, Patrolman Mendoza was hired by the Jennings Police Department in January 2020.  Patrolman Mendoza is currently a defendant in a civil-rights lawsuit in the United States District Court in the Western District of Louisiana.  This lawsuit, filed on December 23, 2019, involves an altercation in which Patrolman Mendoza allegedly fired nine gunshots at a moving truck while on duty for the New Iberia Parish Police Department.  He is sued in his individual capacity.

13.     Defendant Christopher Bergeaux was, at all relevant times herein, a supervising officer with the Jennings Police Department acting and/or neglecting to act in the course and scope of his employment and under color of state law.  He is sued in his individual capacity.

14.     Defendant David Amrine was, at all relevant times herein, an officer with the Welsh Police Department acting and/or neglecting to act in the course and scope of his employment and under color of state law.  He is sued in his individual capacity.

## JURISDICTION AND VENUE

15.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343 because Mr. Howard's claims arise under the Constitution and under 42 U.S.C. §§ 1983 and 1988, and Mr. Howard is seeking redress for violations of his civil rights.  Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over all other claims asserted under the laws of

the State of Louisiana because they arise out of the same operative facts and are so related to

Mr. Howard's federal claims that they are part of the same case or controversy.

16.    Venue is proper in the Western District of Louisiana pursuant to 28 U.S.C.

§ 1391(b)(2) because the events giving rise to Mr. Howard's claims occurred in Jennings,

Louisiana, which is located in the Western District of Louisiana.

## FACTUAL ALLEGATIONS

### A. Background

17.    Mr. Howard is an elementary- and middle-school art teacher, an aspiring stand-up

comedian, and a part-time driver for Uber.  Mr. Howard lives in Newark, New Jersey.

18.    When he has time, Mr. Howard enjoys taking road trips to explore the comedy

scene in different parts of the country, occasionally performing in "open mic" sessions and

visiting friends and family along the way.  He has relatives in North Carolina and Florida and has

enjoyed driving through the South to see them.

19.    In April 2021, while school was out of session for spring recess, Mr. Howard set

out on a planned week-long road trip taking him through Michigan, Wisconsin, Illinois,

Tennessee, Mississippi, and Louisiana.

20.    Mr. Howard drove a 2019 Gray Nissan Sentra, a vehicle that he had been renting

through Uber for several months.  The car bore Virginia license plates.  It did not have tinted

windows.

### B. Patrolman Mendoza Pulls Over Mr. Howard for a Purported Left-Lane Violation

21.    On April 7, Mr. Howard stopped to visit a friend in Sulphur, Louisiana.  The next

morning, Thursday, April 8, he set out on the final leg of his trip, intending to visit cousins in

Kissimmee, Florida.

22.     At approximately 11:20 a.m. CDT, Mr. Howard was heading east in the left lane on I-10, a four-lane interstate highway.  Traffic was busy but flowing, with drivers occupying both eastbound lanes of the road.  Mr. Howard was in the left lane, keeping pace with a line of faster-moving cars that were passing slower-moving cars in the right lane.

23.     Mr. Howard noticed a police cruiser pull onto I-10.  The cruiser followed him briefly, then turned on its flashers to pull him over.  Mr. Howard slowed and stopped on the right shoulder.

24.     Patrolman Mendoza immediately ordered Mr. Howard to get out of his car and approach the police cruiser.  Mr. Howard complied.  Patrolman Mendoza stated that Mr. Howard was being pulled over for driving in the left lane without immediately merging into the right lane after passing another vehicle.  However, under Louisiana law, it is legal to drive in the left lane of a multi-lane highway when overtaking another vehicle, as Mr. Howard had been doing, or when a right-hand lane is congested, as it was at the time.  *See* La. Rev. Stat. Ann. § 32:71.

25.     Patrolman Mendoza then began interrogating Mr. Howard on the details of his trip and his personal life, none of which had any relationship to the alleged left lane violation.  "Where ya coming from?" Patrolman Mendoza asked.  Mr. Howard responded that he was traveling from Sulphur, Louisiana.  "Where ya headed to? . . . Do you live in Sulphur?" Patrolman Mendoza followed up.  Mr. Howard stated that he did not live in Sulphur, but was visiting a friend.

26.     Patrolman Mendoza then began to focus on Mr. Howard's vehicle, asking him a barrage of questions in short succession:  "Is this your vehicle? . . . Whose vehicle is that? . . . Is the vehicle rented under you? . . . How long have you had the rental? . . . Do you have the insurance?"  Mr. Howard explained that the car was a long-term rental in his name that he used

for his part-time work as an Uber driver and that it was insured. Patrolman Mendoza then moved on to more personal questions, asking, "Do you work anywhere, my man? . . . Where do you work at? . . . You're a teacher, in Jersey? . . . What do you teach? . . . How long have you been teaching?"

27.    Patrolman Mendoza asked if Mr. Howard had the rental agreement for his car, and Mr. Howard motioned that it was in the car. Mr. Howard began to approach his car to retrieve the agreement when Patrolman Mendoza stopped him, asking, "Is there any weapons or anything like that, man?" Mr. Howard responded, "No." Patrolman Mendoza followed up by asking, "Do you have any weapons on you?" Again, Mr. Howard said he did not.

28.    Patrolman Mendoza told Mr. Howard he was going to "check" him anyway, adding, "I just want to make sure that you ain't got no weapons." He subjected Mr. Howard to a full pat-down.

29.    Mr. Howard was doing what dozens of other drivers on that stretch of I-10 were doing at the time. But only Mr. Howard had been pulled over, ordered out of his vehicle, subjected to a lengthy questioning unrelated to the reason for the stop, and frisked, all for supposedly violating an obscure traffic law.

30.    After the frisk, Mr. Howard retrieved his rental agreement from the car.

**C. Patrolman Mendoza Unjustifiably Prolongs the Detention**

31.    Upon receiving the rental agreement, Patrolman Mendoza told Mr. Howard, "You can just stand right here while I run all your information," gesturing to the side of the highway behind Mr. Howard's car. Before returning to his police cruiser, Patrolman Mendoza continued the interrogation about Mr. Howard's itinerary, to which Mr. Howard responded that he left New Jersey the prior week and arrived in Sulphur, Louisiana the day before. Patrolman Mendoza then

returned to his police cruiser, leaving Mr. Howard, without his cell phone, waiting on the side of I-10 in near ninety-degree heat.

32.    Once in his police cruiser, Patrolman Mendoza asked the Jennings Police Department radio dispatcher for backup officers, a canine unit, and a broad search of data from license-plate readers to track Mr. Howard's travel history.  Patrolman Mendoza also ran a records check using Mr. Howard's driver's license.  These searches yielded no suspicious activity or criminal history.  They corroborated that Mr. Howard had been on a week-long road trip, as he had told Patrolman Mendoza.

33.    As the searches were being run, Patrolman Mendoza spoke to Sergeant Christopher Bergeaux, a Jennings Police Department supervisor, over the police intercom about Mr. Howard.  During the conversation, Sergeant Bergeaux asked Patrolman Mendoza whether Mr. Howard was "a White guy, Black guy?"  Patrolman Mendoza confirmed that Mr. Howard was Black.

34.    The two officers also discussed the Jennings canine unit that Patrolman Mendoza had tried to call to the scene.  According to Patrolman Mendoza, the Jennings canine unit was unavailable because the officer in charge of the unit was at a training session.  Sergeant Bergeaux seemed surprised by this, joking, "Gosh, how much fucking training has he done?"

35.    Patrolman Mendoza and Sergeant Bergeaux arranged for the temporary use of a canine unit from the neighboring Welsh Police Department.  Patrolman Mendoza did this all while sitting in his air-conditioned car, as Mr. Howard waited on the side of the highway in the heat, on display to all of the drivers passing by.

**D.  Sergeant Bergeaux Arrives and the Officers Continue to Prolong the Detention**

36.     While Patrolman Mendoza was in the car, Sergeant Bergeaux arrived at the scene.
Mr. Howard requested his cell phone, but Sergeant Bergeaux ignored the request.

37.     Patrolman Mendoza finally exited his police cruiser and approached Mr. Howard.
Patrolman Mendoza then asked whether there was anything illegal in Mr. Howard's vehicle.
Mr. Howard said that there was not.  "Nothing?"  Patrolman Mendoza again asked.  "Nothing,"
Mr. Howard confirmed.  Patrolman Mendoza then resumed his interrogation of Mr. Howard,
asking, "How long you stayed in Sulphur?"  At this point, Mr. Howard asked whether he was
free to leave.  "No, you are not," Patrolman Mendoza responded, adding, "I'm going to ask you
for consent to search your vehicle."  Mr. Howard responded, "No."

38.     Patrolman Mendoza instructed Mr. Howard to stand near his police cruiser and
the officers positioned themselves on either side of him.  After Sergeant Bergeaux asked
Mr. Howard whether Patrolman Mendoza told him he was being detained, Patrolman Mendoza
spoke up to amend his previous answer on that point:  "You're free to go, but the vehicle is not."
Sergeant Bergeaux repeated the same line.  Mr. Howard responded, "So I am being detained?
Because I can't go without . . . .", pointing to his car.  Patrolman Mendoza cut him off, "You're
not free to go."  Patrolman Mendoza then quickly corrected himself and repeated the same
refrain that while Mr. Howard was free to go, his vehicle was not.  Of course, Patrolman
Mendoza and Sergeant Bergeaux were aware that Mr. Howard was not able to leave his rented
vehicle, with his phone and his wallet inside, and walk off I-10 on foot.

39.     Still unsuccessful in wrangling consent to search Mr. Howard's car, Patrolman
Mendoza warned Mr. Howard, "The dog is coming. . . . If there is anything right now in that
vehicle that I can put in the citation, right now is the time to let me know.  And if we can put it in

the citation, you will be on your way.  Right now is the time to let me know if there's anything illegal inside the vehicle."

40.    Mr. Howard then pointed out to the officers that he had been "pulled over for nothing," that he had no criminal record, his license was clean, and he had never even been arrested before.  Mocking Mr. Howard's situation, Sergeant Bergeaux responded that Mr. Howard looked like he was about to pass out.  Mr. Howard noted the unnerving reality of the situation: that he was a Black man who was pulled over when there "were five other cars doing the same thing" and now he was being "subject to a search, for what?  Nothing."

41.    As Mr. Howard, Patrolman Mendoza, and Sergeant Bergeaux stood waiting for the canine unit to arrive, Sergeant Bergeaux again mocked Mr. Howard for looking upset, asking, "You alright?  Just checking on you, man.  You got me nervous for you!"  Joining in, Patrolman Mendoza added, "It's hot outside and you got goosebumps!"

42.    Mr. Howard responded, "You ever been Black?  You ever been pulled over by two police in Louisiana for nothing and now you are being asked to be subject to a search?  After everything going on in this country?  You've ever been Black in these situations? . . . You see what happens to people like me in these situations."  Mr. Howard was referring to the murders of George Floyd in 2020 and many other Black men and women at the hands of police officers over the past several years.[4]  Patrolman Mendoza replied, "It's not by skin color, man, you're making that assumption."  Mr. Howard answered, "I wish I was in your position to say that."

---

[4] *See, e.g.*, Fatal Force, Wash. Post. (March 15, 2022), https://www.washingtonpost.com/graphics/investigations/police-shootings-database/ ("Black Americans are killed [by police] at a much higher rate than White Americans."); Tim Arango & Giulia Heyward, Despite Uproar Over Floyd's Death, the Number of Fatal Encounters with Police Hasn't Changed (Dec. 27, 2021), https://www.nytimes.com/2021/12/24/us/police-killings-accountability.html; Cheryl W. Thompson, NPR, Fatal Shootings of Unarmed Black People Reveal Troubling Patterns (Jan. 25, 2021), https://www.npr.org/2021/01/25/956177021/fatal-police-shootings-of-unarmed-black-people-reveal-troubling-patterns ("Since 2015, police officers have fatally shot at least 135 unarmed Black men and women nationwide, an NPR investigation has found.").

43.     As Patrolman Mendoza filled out the traffic ticket, Sergeant Bergeaux chimed in, "As long as you do what's told, everything is fine."  Mr. Howard reminded the officers, "I have a right to not be subject to a search."

44.     While continuing to wait for the canine unit, Mr. Howard asked whether the stop was being recorded for his protection since he was "the only one who did not have any type of weapon."  Sergeant Bergeaux confirmed that it was.[5]

45.     Patrolman Mendoza then asked if Mr. Howard wanted to sign the traffic citation or wait until after the canine unit conducted its search.  Mr. Howard asked if he would be able to leave if he signed the citation, and Patrolman Mendoza returned to his illusory proposition that the stop was over for *Mr. Howard*, but not for *his vehicle*.

46.     When Mr. Howard noted that the officers did not have probable cause to detain and search his vehicle, Patrolman Mendoza called him "Mr. Street Lawyer," and said, "Listen . . . I don't know who taught you law . . . . That might be [the case] in New Jersey . . . ." Patrolman Mendoza did not complete his response, but the obvious inference is that Jennings Police Department officers do not consider themselves bound by 100 years of law requiring probable cause to conduct a warrantless search of a vehicle.

**E.  Unlawful Canine Search**

47.     Half an hour after Mr. Howard was initially ordered to exit his vehicle and stand on the side of the highway, an officer from the Welsh Police Department—Officer David Amrine—finally arrived with a German Shepherd police dog.

48.     At this point, Mr. Howard again requested permission to retrieve his cell phone so that he could record the canine search.  Sergeant Bergeaux responded that everything was being

---

[5] Nonetheless, as discussed below, Jennings Police Department now claims that Sergeant Bergeaux's video was in fact "corrupted" and that no viewable version exists.

recorded by the officers' body and vehicle-mounted cameras.  Mr. Howard again asked why he

could not get his phone if he was not under arrest.  Sergeant Bergeaux, still holding the traffic

ticket, warned him, "You're not going to the car."  Patrolman Mendoza agreed, "You cannot get

in the car right now."  Mr. Howard explained to the officers that he "just [wanted] to make sure

[the search was] done right," and he requested that Patrolman Mendoza retrieve his cell phone

for him if he could not get it himself.  Sergeant Bergeaux responded that Patrolman Mendoza

will "get the phone for you if he chooses so."  Patrolman Mendoza did not give Mr. Howard his

phone.

49.    Sergeant Bergeaux then warned Mr. Howard to stay still because sudden

movements might prompt the dog to attack him, taunting him, "Whatever you do, just stay there

. . . .  I just don't want nothing to happen to you . . . .  I just don't want you to get bit."

50.    As Officer Amrine approached Mr. Howard's vehicle and took the dog out of the

car, he repeatedly asked the dog in an excited tone whether he was "ready to go find [his] ball."

51.    Officer Amrine and the dog then proceeded to examine the grass by the side of

the road next to the car and circle the car.  Officer Amrine led the dog around the car for

approximately five minutes, tapping on the vehicle in various places and speaking to the dog.

Officer Amrine and the dog circled the car at least three times.  The dog showed no discernible

interest in the vehicle or its immediate surroundings.  In fact, Officer Amrine had to call the

dog's attention back to the car several times, at one point telling the dog, "You're not going over

there!", and instructing the dog to drop something.  He repeatedly ordered the dog to "Check

here!" at various spots around the car.

52.    Circling clockwise around the car one last time, Officer Amrine held the leash in

his right hand and stepped backwards, with his left hand tapping the side of the car at waist level.

As he reached the left side of the trunk, he dropped his left hand below his waist, and then the dog sat down. Officer Amrine then circled the left rear of the car, and the dog looked to the right as the leash went taut in that same direction. The dog did not bark. It did not scratch at anything. The dog then looked back at Officer Amrine, and they both walked away. Patrolman Mendoza had to ask if this was an alert as Officer Amrine walked past him. Officer Amrine claimed it was.

53.     As Sergeant Bergeaux relayed this response to Mr. Howard, Mr. Howard was incredulous. Sergeant Bergeaux asked, "You didn't see him react?" — apparently referring to the dog quietly taking a seat after five minutes of circling the car with no reaction at all, the same behavior that Patrolman Mendoza did not recognize as an alert. Mr. Howard objected that the dog only sat down because of Officer Amrine's motions. Sergeant Bergeaux insisted, "That's not how it works, man." Mr. Howard turned away, exasperated: "Oh God, whatever."

**F. Patrolman Mendoza Conducts an Invasive and Unlawful Search of Mr. Howard's Car**

54.     Now nearly forty minutes into the stop, Patrolman Mendoza again asked Mr. Howard if there was anything illegal in his car. Mr. Howard asked, still in disbelief, "Is it a positive [alert]?" Patrolman Mendoza said it was. At this point, recognizing that after a purported canine "alert," there was no chance the Jennings officers were going to let him drive off, and fearing the consequences of stating otherwise, Mr. Howard threw up his hands and said, "Go ahead and search."

55.     Before the search began, Patrolman Mendoza asked Mr. Howard if he wanted his cell phone. Mr. Howard said he did, and Patrolman Mendoza followed up to ask, "Where's your phone at?" But when Patrolman Mendoza went to get the phone, Sergeant Bergeaux approached him. Out of Mr. Howard's hearing, Sergeant Bergeaux asked Patrolman Mendoza, "Are you

really going to give him his phone? . . . Are you really going to give it to him?"  After thinking about Sergeant Bergeaux's question for a moment, Patrolman Mendoza placed the phone on top of the car, out of Mr. Howard's reach.

56.    Patrolman Mendoza then searched Mr. Howard's car for approximately fifteen minutes.  He began by looking in the trunk, opening the zippers on various bags, digging through them and removing Mr. Howard's personal effects, opening and rummaging through smaller items and moving the bags around the trunk in the process.  He also removed the lining from the trunk to examine the area underneath it, opened the compartment on the floor of the trunk in which the spare tire was stored, pushed back the items sitting on top of it, and inspected underneath the back of the car.

57.    Finding nothing in the trunk, Patrolman Mendoza moved on to other parts of the car that did not trigger the supposed canine alert, starting with the back seat and proceeding to the front of the vehicle.  Prying things open with a screwdriver, Patrolman Mendoza searched virtually every crevice of Mr. Howard's car:  the underside, inside the hood, the door and window paneling, the glove compartment, and behind the overhead-sunglasses compartment, dismantling sections of the vehicle's interior in the process.  He looked through all of the items in the back and front seats, again digging through various containers and their contents, and he examined under the seats and the driver's seat floor mat.  He also shook the driver and passenger doors.

58.    All the while, Mr. Howard was left standing on the side of I-10 in ninety-degree heat as the midday traffic went by.

59.    In the end, after rummaging through all of Mr. Howard's personal belongings, Patrolman Mendoza found nothing illegal.  Not bothering to reassemble the components of the

vehicle that he had pulled apart, Patrolman Mendoza handed Mr. Howard his driver's license, registration and cell phone; asked Mr. Howard to sign the ticket he had previously filled in for the purported left-lane violation; and told him that he and his car were free to leave, indicating that prior to this point he had not been. But in doing so, Patrolman Mendoza neglected to hand the ticket over to Mr. Howard; Mr. Howard reminded Patrolman Mendoza to do so.

60.     Finally, approximately one hour after the initial stop, Mr. Howard departed. Feeling violated and shaken by the encounter, Mr. Howard abandoned his plan to visit family in Florida and drove straight home to New Jersey.

61.     After Mr. Howard left, even though Patrolman Mendoza had searched Mr. Howard's entire vehicle and found nothing illegal, the officers stuck around. Patrolman Mendoza acknowledged that he had searched the spare tire compartment and the sides of the trunk, but neither had been "fucked with."

**G. Jennings Police Department Dismisses Mr. Howard's Ticket**

62.     On his way back to New Jersey, Mr. Howard called friends and family (some of whom are psychologists and police officers) in an attempt to understand the Officer Defendants' unlawful actions and their reasoning for singling him out.

63.     Over the following days, Mr. Howard followed up with Jennings about his encounter with Patrolman Mendoza, Sergeant Bergeaux, Officer Amrine, and the canine. He first called the Jennings Police Department and asked to speak with a supervisor. He was told that he would get a call back, but he did not. Mr. Howard called Jennings City Hall and was told that they would investigate the incident, but he also never heard back from them. Mr. Howard then tried the Jennings Police Department again, this time requesting video footage from the incident. The Jennings Police Department told him he would need to get a subpoena to obtain

the video recording.  The Jennings Police Department subsequently dismissed Mr. Howard's ticket with no explanation.

**H.  The Impact of the Events of April 8, 2021 on Mr. Howard**

64.    Mr. Howard would like to visit Louisiana again in the future, as he has done in the past, to see friends and enjoy his favorite pastimes of taking long road trips and seeing comedy shows throughout the country.  However, given Defendants' unlawful conduct on April 8, 2021, he is now afraid to drive through Louisiana.  Since April 8, 2021, other than quick, direct trips to see family, Mr. Howard has opted to fly rather than travel long distances by car.

65.    Although Mr. Howard continues to drive for Uber, he fears being pulled over, frisked, and detained for no reason every time he drives.

**I.  Counsel's Subsequent Investigation Reveals Significant Failures of Hiring, Oversight, Discipline and Conduct**

66.    Mr. Howard, through counsel, submitted multiple records requests to the Jennings and Welsh Police Departments.  Through these records requests, Mr. Howard was finally able to acquire video footage of the incident.  However, while Patrolman Mendoza's body camera footage was viewable, Sergeant Bergeaux's body camera footage was corrupted and useless.

67.    The records requests also revealed that the Jennings Police Department's supervision of its officers is wholly inadequate.  In response to counsel's requests for records showing the Department's policies, guidance, training, and oversight of officers in the context of traffic stops and automobile searches, the Department was able to produce only a two-page policy document on racial profiling, which includes just two sentences that describe "biased-based profiling"; a three-page policy document on traffic stops; and a similarly short policy document on the use of canine units, which fails to even state what canine response constitutes an "alert," justifying a search.  Other than these three documents—collectively amounting to just

11 pages—the Jennings Police Department has no other training, policy, or guidance documents that are designed to ensure that traffic stops and automobile searches are conducted in a lawful manner.  Likewise, the Welsh Police Department was only able to provide a short training manual on the use of canine units; it also failed to identify any indicators for a canine "alert."

68.     Counsel's records requests also confirmed that the Jennings Police Department does not track how frequently canine units are deployed during traffic stops, a simple practice that would enable the Jennings Police Department to assess whether its officers use such units disproportionately in traffic stops involving persons of color.  And while the Jennings Police Department does maintain traffic-stop records, it does not monitor those records for patterns that might show whether its officers disproportionately enforce minor traffic violations, including La. Rev. Stat. Ann. § 32:71, against drivers of color.

69.     In addition, counsel's records requests revealed the Jennings Police Department's systematic failure to take corrective action against officers involved in illegal conduct. Notwithstanding Mr. Howard's multiple complaints to the Jennings Police Department and the City of Jennings, the Jennings Police Department confirmed that it has no records showing that it has ever instituted disciplinary or investigatory proceedings against Patrolman Mendoza or Sergeant Bergeaux in connection with the April 8, 2021 stop or otherwise.  The Jennings Police Department also confirmed that it has no records showing that it has ever instituted disciplinary or investigatory proceedings against any police officer concerning a pretextual traffic stop or the illegal use of a canine unit.  This is in spite of a disturbing trend of unconstitutional and racist behavior on the part of officers of the Jennings Police Department—including Patrolman

Mendoza and Sergeant Bergeaux—which has been widely documented in publicly filed civil-rights complaints and reports in the media.[6]

70.     Finally, Counsel's investigation revealed that the City of Jennings hired Patrolman Mendoza despite a public civil-rights complaint filed against him regarding an incident on or around December 23, 2018, in which he is accused of recklessly discharging nine gunshots at a moving vehicle, striking one individual in the leg.

## CLAIMS FOR RELIEF

### COUNT I

**Unlawful Traffic Stop in Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution, and Article I, Section 5 of the Louisiana Constitution (against Patrolman Mendoza)**

71.     Mr. Howard hereby incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

72.     Mr. Howard is authorized to vindicate violations of his federal constitutional rights under 42 U.S.C. § 1983, and of state constitutional rights pursuant to an implied right of action under Louisiana law.  *See Moresi* v. *Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1092–93 (La. 1990).

---

[6] *See* Complaint, *Fearheily* v. *Mendoza*, No. 2:21-cv-00305 (W.D. La. Feb. 3, 2021); Complaint, *Mata* v. *Mendoza*, No. 19-cv-01670 (W.D. La. Dec. 23, 2019); Complaint, *Goodwin* v. *D'Albor*, No. 18-cv-00588 (W.D. La. Apr. 30, 2018); *Lehman* v. *D'Albor*, No. 16-cv-00783 (W.D. La. June 7, 2016); Complaint, *Bruchhaus* v. *City of Jennings*, No. 15-cv-02649 (W.D. La. Nov. 6, 2015); Complaint, *Edmonson* v. *City of Jennings*, No. 15-cv-02113 (W.D. La. July 29, 2015); Complaint, *Lyons* v. *City of Jennings*, No. 06-cv-00621 (W.D. La. Apr. 13, 2006); Complaint, *Amie* v. *City of Jennings*, No. 03-cv-02011 (W.D. La. Oct. 29, 2003); Complaint, *Gotreaux* v. *Edwards*, No. 02-cv-00535 (W.D. La. Mar. 18, 2002); *see also* Mercedes Montagnes, Promise of Justice Initiative, Request for CRIPA Investigation into Sexual Misconduct in the Jefferson Davis Parish Jail and Other Misconduct by Jefferson Davis Parish and Jennings City Law Enforcement Agencies (Jul. 8, 2020), available at: https://static1.squarespace.com/static/5fe0e9cce6e50722511b03cc/t/6002475ef3d9ba77658dc2bc/ 1610762080196/2020.07.08-Jefferson-Davis-Parish-CRIPA-Complaint-1-1.pdf; Allison Cryer, City Settles Lawsuit with Former JPD Employee (Jan. 13, 2019), https://tomaswell.files.wordpress.com/2019/01/city-of-jennings-settles-1.pdf; KPLC News, Update: Jennings P.D. Scandal (Aug. 15, 2003), https://www.kplctv.com/story/1404036/update-jennings-pd-scandal/.

73.     Since no later than March 27, 1979,[7] it has been clearly established that police officers may not effectuate a seizure by stopping a vehicle and detaining its occupants absent reasonable suspicion, based on particularized and articulable facts, that the motorist has violated the law.

74.     Patrolman Mendoza lacked any particularized reasonable suspicion to believe that Mr. Howard had violated the law.

75.     Nonetheless, Patrolman Mendoza ordered Mr. Howard to pull over, forced him to exit his car, and detained Mr. Howard for an hour.

76.     At the time that Patrolman Mendoza conducted this unlawful seizure of Mr. Howard, Patrolman Mendoza was operating under color of law.  He was wearing a uniform of the Jennings Police Department and held himself out as an officer of the Jennings Police Department.

77.     No reasonable officer in Patrolman Mendoza's position would have believed that lawful justification existed for the traffic stop.

78.     Patrolman Mendoza's conduct thus violated Mr. Howard's clearly established rights, of which a reasonable officer would or should know.

79.     Patrolman Mendoza's actions were either taken with the intent of depriving Mr. Howard of his constitutional rights, or made with reckless or callous indifference to those rights.

80.     As a direct and proximate result of Patrolman Mendoza's conduct as set forth above, Mr. Howard suffered damages in an amount to be proven at trial.

---

[7] *See Delaware* v. *Prouse*, 440 U.S. 648 (1979).

81.    As a direct and proximate result of Patrolman Mendoza's conduct as set forth above, Mr. Howard suffered and continues to suffer fear, embarrassment, humiliation, and pain.

82.    Mr. Howard is entitled to monetary relief, including nominal, compensatory, and punitive damages, and declaratory relief for this claim.

## COUNT II

**Unlawful Search of Mr. Howard's Person in Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution, and Article I, Section 5 of the Louisiana Constitution (against Patrolman Mendoza)**

83.    Mr. Howard hereby incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

84.    Mr. Howard is authorized to vindicate violations of his federal constitutional rights under 42 U.S.C. § 1983, and of state constitutional rights pursuant to an implied right of action under Louisiana law.  *See Moresi* v. *Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1092–93 (La. 1990).

85.    Since no later than December 5, 1977,[8] it has been clearly established that police officers may not pat down an individual stopped for a traffic violation absent reasonable suspicion that the individual is armed and dangerous.

86.    Patrolman Mendoza lacked any particularized reasonable suspicion to believe that Mr. Howard was armed and dangerous.

87.    Nonetheless, Patrolman Mendoza initiated a pat-down of Mr. Howard to search for weapons that he had no reason to believe were on Mr. Howard's person.

88.    At the time that Patrolman Mendoza conducted this unlawful search of Mr. Howard, Patrolman Mendoza was operating under color of law.  He was wearing a uniform

---

[8] *See Pennsylvania* v. *Mimms*, 434 U.S. 106 (1977).

of the Jennings Police Department and held himself out as an officer of the Jennings Police Department.

89.     No reasonable officer in Patrolman Mendoza's position would have believed that lawful justification existed for the pat-down.

90.     Patrolman Mendoza's conduct thus violated Mr. Howard's clearly established rights, of which a reasonable officer would or should know.

91.     Patrolman Mendoza's actions were either taken with the intent of depriving Mr. Howard of his constitutional rights, or made with reckless or callous indifference to those rights.

92.     As a direct and proximate result of Patrolman Mendoza's conduct as set forth above, Mr. Howard suffered damages in an amount to be proven at trial.

93.     As a direct and proximate result of Patrolman Mendoza's conduct as set forth above, Mr. Howard suffered and continues to suffer fear, embarrassment, humiliation, and pain.

94.     Mr. Howard is entitled to monetary relief, including nominal, compensatory, and punitive damages, and declaratory relief for this claim.

## COUNT III

**Unlawful Extension of Detention in Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution, La. Code Crim. Proc. Ann. art. 215.1(D), and Article I, Section 5 of the Louisiana Constitution (against Defendants Mendoza, Bergeaux, and Amrine)**

95.     Mr. Howard hereby incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

96.     Mr. Howard is authorized to vindicate violations of his federal constitutional rights under 42 U.S.C. § 1983, and of state constitutional rights pursuant to an implied right of

action under Louisiana law.  *See Moresi* v. *Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1092–93 (La. 1990).

97.    Since no later than April 21, 2015,[9] it has been clearly established that a traffic stop runs afoul of an individual's right against unreasonable seizures under the U.S. and Louisiana constitutions if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket.  Pursuant to this rule, a police officer may not extend a routine traffic stop to conduct a canine search, absent reasonable suspicion of an independent crime.

98.    There was no lawful justification for the stop of Mr. Howard, but even had there been, Patrolman Mendoza and Sergeant Bergeaux would have been able to complete and issue the traffic citation to Mr. Howard long before the canine unit arrived and before the officers conducted an unconstitutional search of Mr. Howard's car.  In fact, Patrolman Mendoza had completed Mr. Howard's ticket before the canine unit arrived.

99.    There was no lawful justification for extending the stop beyond the initial request for Mr. Howard's identification and paperwork.  Nothing arose during the Officer Defendants' detention of Mr. Howard and his vehicle that provided them with reasonable suspicion that Mr. Howard had committed any infraction beyond their stated (pretextual) motive for pulling him over, so as to justify the hour-long detention.

100.    Mr. Howard's traffic stop was impermissibly extended without reasonable suspicion or probable cause and was therefore unlawful and violative of his rights.

101.    At the time that the Officer Defendants impermissibly extended the detention of Mr. Howard, they were operating under color of law.  They were wearing uniforms of the

---

[9] *See Rodriguez* v. *United States*, 575 U.S. 348 (2015).

Jennings or Welsh Police Department, including their badges, and held themselves out as officers or deputies of their respective departments.

102.    No reasonable officer in the Officer Defendants' position would have believed that lawful justification existed for the canine search.

103.    The Officer Defendants' conduct thus violated Mr. Howard's clearly established rights, of which reasonable officers would or should know.

104.    The Officer Defendants' actions were either taken with the intent of depriving Mr. Howard of his constitutional rights, or made with reckless or callous indifference to those rights.

105.    As a direct and proximate result of the Officer Defendants' conduct as set forth above, Mr. Howard suffered damages in an amount to be proven at trial.

106.    As a direct and proximate result of the Officer Defendants' conduct as set forth above, Mr. Howard suffered and continues to suffer fear, embarrassment, humiliation, and pain.

107.    Mr. Howard is entitled to monetary relief, including nominal, compensatory, and punitive damages, and declaratory relief for this claim.

## COUNT IV

**Unlawful Search of Mr. Howard's Vehicle in Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution, and Article I, Section 5 of the Louisiana Constitution (against Patrolman Mendoza, Sergeant Bergeaux, and Officer Amrine)**

108.    Mr. Howard hereby incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

109.    Mr. Howard is authorized to vindicate violations of his federal constitutional rights under 42 U.S.C. § 1983, and of state constitutional rights pursuant to an implied right of action under Louisiana law.  *See Moresi* v. *Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1092–93 (La. 1990).

110.    Since no later than March 2, 1925,[10] it has been clearly established that police may not search a vehicle without a warrant or without probable cause reasonably arising out of circumstances known to the officer that the automobile would contain contraband.

111.    The Officer Defendants searched Mr. Howard's vehicle without a warrant, without probable cause, without Mr. Howard's free or voluntary consent, and based on a fabricated and pretextual canine "alert."  The search included portions of Mr. Howard's vehicle beyond the trunk, the only part of the vehicle that supposedly gave rise to the "alert."

112.    In reality, nothing arose during the Officer Defendants' detention of Mr. Howard or the canine search to justify the Officer Defendants' unlawful search of his vehicle.  The Officer Defendants lacked any probable cause or even reasonable suspicion that Mr. Howard's vehicle contained any contraband.

113.    At the time that the Officer Defendants impermissibly searched Mr. Howard's vehicle, they were operating under color of law.  They were wearing uniforms of the Jennings or Welsh Police Department, including their badges, and held themselves out as officers or deputies of their respective departments.

114.    No reasonable officer in the Officer Defendants' position would have believed that lawful justification existed for the search of Mr. Howard's car.

115.    The Officer Defendants' conduct thus violated Mr. Howard's clearly established rights, of which reasonable officers would or should know.

116.    The Officer Defendants' actions were either taken with the intent of depriving Mr. Howard of his constitutional rights, or made with reckless or callous indifference to those rights.

---

[10] *See Caroll* v. *United States*, 267 U.S. 132 (1925).

117.    As a direct and proximate result of the Officer Defendants' conduct as set forth above, Mr. Howard suffered damages in an amount to be proven at trial.

118.    As a direct and proximate result of the Officer Defendants' conduct as set forth above, Mr. Howard suffered and continues to suffer fear, embarrassment, humiliation, and pain.

119.    Mr. Howard is entitled to monetary relief, including nominal, compensatory, and punitive damages, and declaratory relief for this claim.

## COUNT V

**Unlawful Traffic Stop, Seizure, Detention, and Search in Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution
(against Patrolman Mendoza, Sergeant Bergeaux, and Officer Amrine)**

120.    Mr. Howard hereby incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

121.    Mr. Howard is authorized to vindicate violations of his federal constitutional rights under 42 U.S.C. § 1983.

122.    Since no later than June 10, 1996,[11] it has been clearly established that a police officer's selective enforcement of the traffic laws based on race violates the Equal Protection Clause of the Fourteenth Amendment.

123.    On April 8, 2021, Patrolman Mendoza lacked any particularized reasonable suspicion to believe that Mr. Howard had violated any traffic law, including La. Rev. Stat. Ann. § 32:71.

124.    Nonetheless, the Officer Defendants ordered Mr. Howard to pull over, forced him to exit his car, subjected him to an unjustified frisk, detained him for an hour, subjected him to a

---

[11] *See Whren* v. *United States*, 517 U.S. 806 (1996).

25

canine search without reasonable suspicion of criminal activity, and illegally searched his vehicle, all on account of Mr. Howard's race.

125.    The Officer Defendants' discriminatory intent is clear through comments referencing Mr. Howard's race—made either explicitly or implicitly—by the Officer Defendants throughout the traffic stop; the utter lack of an alternative explanation for the initial stop and the rapid escalation of what should have been a routine traffic stop; and the Jennings Police Department's minimal training on racial profiling, which enabled the Officer Defendants' illegal searches and seizures.

126.    At the time that the Officer Defendants conducted these unlawful searches and seizures of Mr. Howard and his vehicle, they were operating under color of law.  The Officer Defendants were wearing the uniforms of the Jennings or Welsh Police Department and held themselves out as officers of those police departments.

127.    No reasonable officer in the Officer Defendants' position would have believed that lawful justification existed for the traffic stop, the frisk, the detention, the canine search, or the subsequent vehicle search.

128.    The Officer Defendants' conduct thus violated Mr. Howard's clearly established rights, of which a reasonable officer would or should know.

129.    The Officer Defendants' actions were either taken with the intent of depriving Mr. Howard of his constitutional rights, or made with reckless or callous indifference to those rights.

130.    As a direct and proximate result of the Officer Defendants' conduct as set forth above, Mr. Howard suffered damages in an amount to be proven at trial.

131.    As a direct and proximate result of the Officer Defendants' conduct as set forth above, Mr. Howard suffered and continues to suffer fear, embarrassment, humiliation, and pain.

132.    Mr. Howard is entitled to monetary relief, including nominative, compensatory, and punitive damages, and declaratory relief for this claim.

## COUNT VI

### *Monell*[12] Liability for Failure to Supervise, Investigate, and Discipline
### (against the City of Jennings, Louisiana)

133.    Mr. Howard hereby incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

134.    Mr. Howard is authorized to vindicate violations of his federal constitutional rights under 42 U.S.C. § 1983.

135.    Section 1983 establishes municipal liability for inadequate police supervision, investigation, and discipline where such failures amount to deliberate indifference to the constitutional rights of persons with whom the police come into contact.

136.    The City of Jennings had ultimate supervisory authority over the Jennings Police Department and its officers, including Patrolman Mendoza and Sergeant Bergeaux, at all times relevant herein, and the ultimate responsibility to ensure that all of the Jennings Police Department officers were adequately trained and conducted themselves in compliance with the law.

137.    Even if the Jennings Police Department had implemented policies governing when certain stops and searches could be constitutionally conducted, the City of Jennings, through the Department or its Chief of Police Daniel Semmes, did nothing to ensure those policies were followed by its officers.  The City of Jennings failed to adequately supervise, train,

---

[12] *Monell* v. *Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

or provide guidance to Jennings Police Department officers, including Patrolman Mendoza and Sergeant Bergeaux, regarding when and how to properly conduct traffic stops, searches and seizures incident to traffic stops, and the appropriate use of police canine units, pursuant to the strictures of the Fourth and Fourteenth Amendments of the United States Constitution.

138.    Upon information and belief based on records provided by the Jennings Police Department in response to public records requests and communications with the Jennings City Attorney, the City of Jennings does not train or offer guidance to its officers on how to properly conduct traffic stops, searches and seizures incident to traffic stops, and the appropriate uses of police canine units.

139.    Upon information and belief based on records provided by the Jennings Police Department in response to public records requests and communications with the Jennings City Attorney, the City of Jennings does not monitor or track officers' conduct with respect to traffic stops, searches and seizures incident to traffic stops, and the use of police canine units during traffic stops to ensure that they are conducted in compliance with the law.

140.    Jennings Police Department officers, including Patrolman Mendoza and Sergeant Bergeaux, routinely conduct traffic stops, and searches and seizures in connection with such stops.  That Jennings Police Department officers might violate individuals' Fourth and Fourteenth Amendment rights in connection with traffic stops is a highly predictable consequence of the City of Jennings's decision to inadequately supervise, investigate, and discipline its police force.

141.    The City of Jennings's failure to supervise constitutes an official policy and custom.  Given the self-evident need to supervise police officers who routinely conduct traffic

stops on the commands of the Fourth and Fourteenth Amendments of the U.S. Constitution, this failure to supervise evinces a deliberate indifference to Mr. Howard's constitutional rights.

142.    The failure to supervise Patrolman Mendoza and Sergeant Bergeaux in particular resulted in injury to Mr. Howard, in the form of subjecting him to an unconstitutional stop, lengthy detention, and unjustified search of his person and vehicle. The City of Jennings, through the failure to supervise Patrolman Mendoza and Sergeant Bergeaux, directly and proximately caused the constitutional violations to which Mr. Howard was subjected and was the driving force behind those constitutional violations.

143.    The City of Jennings, through the Jennings Police Department and Police Chief Semmes, also has a policy, custom, and pattern of tacitly approving police misconduct caused, in part, by a failure to track and investigate potential police misconduct and a failure to discipline officers for policy and constitutional violations. The inability of Mr. Howard to properly log a complaint with the Jennings Police Department to report the blatant violations of his constitutional rights by Patrolman Mendoza and Sergeant Bergeaux demonstrates the City of Jennings's complete abdication of its supervisory responsibilities to investigate and discipline incidents of police misconduct, including the April 8, 2021 stop of Mr. Howard. This abdication of responsibility was grossly negligent, reckless, and deliberate, such that continued police misconduct was almost inevitable or substantially certain to result.

144.    The City of Jennings, through the Jennings Police Department and Police Chief Semmes, did not discipline Patrolman Mendoza or Sergeant Bergeaux for their violations of any written policies or violations of Mr. Howard's rights.

145.    Upon information and belief, it is also a policy and/or custom of the City of Jennings to inadequately investigate instances or patterns of misconduct in connection with

traffic stops and not discipline officers who violate department policies in connection with traffic stops.

146.    As a result of these policies and/or customs, Patrolman Mendoza and Sergeant Bergeaux believed that supervisory officers would not meaningfully monitor their actions and their continued misconduct would be tolerated.

147.    The City of Jennings's policy and/or custom of not investigating instances or patterns of misconduct concerning traffic stops and not disciplining officers who violate policies in connection with traffic stops amounted to a deliberate indifference to Mr. Howard's Fourth and Fourteenth Amendment rights that resulted in the actual violation of Mr. Howard's Fourth and Fourteenth Amendment rights.

148.    As a direct and proximate result of the Officer Defendants' conduct as set forth above, Mr. Howard suffered and continues to suffer fear, embarrassment, humiliation, and pain.

149.    Mr. Howard is entitled to monetary relief, including nominative, compensatory, and punitive damages, and declaratory relief for this claim.

## <u>COUNT VII</u>

**La. Civ. Code art. 2315 – Negligent Hiring**
**(against City of Jennings, Louisiana)**

150.    Mr. Howard hereby incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

151.    Under Louisiana law, a municipal employer has a duty to exercise reasonable care in hiring, training, and retaining its deputies.

152.    The City of Jennings breached its duty to exercise reasonable care in hiring Patrolman Mendoza.  A reasonable background check would have informed the hiring authority of the City of Jennings that Patrolman Mendoza had been involved in an incident on or around

December 23, 2018, in which he discharged nine gunshots at a moving vehicle, striking one individual in the leg, while acting under color of law as an officer of the New Iberia Police Department.  The widespread reporting on the incident and the subsequent civil-rights lawsuit brought against Patrolman Mendoza suggest that Patrolman Mendoza did not have a reasonable basis to resort to the use of deadly force under the circumstances.  Thus, the City of Jennings either knew or should have known of this past incident, as the information was in the public domain and readily accessible upon a reasonable search.  Any responsible municipality that knew of these allegations would not have hired Patrolman Mendoza.

153.    The City of Jennings breached its duty to exercise reasonable care in hiring Patrolman Mendoza.  As a direct and proximate result of the City of Jennings's conduct, Mr. Howard suffered monetary damages at the hands of Patrolman Mendoza on April 8, 2021 in an amount to be proven at trial, and suffered and continues to suffer fear, embarrassment, humiliation, and pain.

154.    Mr. Howard is entitled to monetary relief, including nominal, compensatory, and punitive damages, and declaratory relief for this claim.

## COUNT VIII

### La. Civ. Code art. 2315 – False Imprisonment
### (against Patrolman Mendoza, Sergeant Bergeaux, and Officer Amrine)

155.    Mr. Howard  hereby  incorporates  by  reference  and  realleges  each  and  every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

156.    The Officer Defendants detained and imprisoned Mr. Howard against his will for an hour.

157.    The Officer Defendants lacked probable cause, reasonable suspicion, or any other lawful justification based on articulable facts to detain Mr. Howard.

158.    The Officer Defendants intentionally stopped Mr. Howard against his will and held him captive for an hour on the side of a busy interstate highway.  Throughout this hour, the Officer Defendants, who surrounded Mr. Howard, interrogated, mocked and threatened him. Mr. Howard was not granted access to his cell phone or wallet and was instructed that his vehicle was not to leave the Officer Defendants' presence.  This meant that Mr. Howard could not leave their presence either.

159.    After Patrolman Mendoza pulled Mr. Howard over under the pretext of a violation of La. Rev. Stat. Ann. § 32:71, the stop was impermissibly extended without reasonable suspicion or probable cause.  The Officer Defendants acted with conscious desire or knowledge to a substantial certainty that Mr. Howard would be confined to the side of I-10 when they restricted his movement.

160.    As a direct and proximate result of the Officer Defendants' conduct as set forth above, Mr. Howard suffered monetary damages in an amount to be proven at trial, and suffered and continues to suffer fear, embarrassment, humiliation, and pain.

161.    Mr. Howard is entitled to monetary relief, including nominal, compensatory, and punitive damages, and declaratory relief for this claim.

## COUNT IX

**Title VI of the Civil Rights Act of 1964 – Intentional Discrimination
(against City of Jennings)**

162.    Mr. Howard hereby incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

163.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) *et seq.*, prohibits intentional discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance, including law enforcement programs and activities.  It thus

prohibits law enforcement officers from conducting police activities in a manner that is motivated by race or ethnicity.

164.    Defendant City of Jennings receives federal financial assistance, including, on information and belief, for law enforcement activities.

165.    At the time of the discriminatory stop and search, Mr. Howard was an intended beneficiary of the federally funded law enforcement activities because he was among the drivers and other people that the City of Jennings was charged with protecting within its jurisdiction.

166.    Defendant City of Jennings devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of Jennings Police Department officers and personnel operating checkpoints and engaging in aggressive, punitive traffic enforcement in a manner that was motivated by race and ethnicity.

167.    Defendant City of Jennings, operating through the Officer Defendants, ordered Mr. Howard to pull over, forced him to exit his car, subjected him to an unjustified frisk, detained him for an hour, subjected him to a canine search without reasonable suspicion of criminal activity, and illegally searched his vehicle, all on account of Mr. Howard's race.

168.    The Officer Defendants' discriminatory intent is made clear through comments referencing Mr. Howard's race made—either explicitly or implicitly—by the Officer Defendants throughout the traffic stop; the utter lack of an alternative explanation for the initial stop and the rapid escalation of what should have been a routine traffic stop; and the Jennings Police Department's minimal training on racial profiling.

169.    Defendant City of Jennings is responsible for the discriminatory actions taken by its employees, Patrolman Mendoza and Sergeant Bergeaux, as a result of the policy, practice,

and/or custom that it devised, implemented, enforced, encouraged, and sanctioned to conduct aggressive, punitive traffic enforcement in a manner that is motivated by race and ethnicity.

170.    As a direct and proximate result of Defendant City of Jennings's policies, practices, and/or customs, Mr. Howard has suffered and will continue to suffer compensable harm, including financial harm, fear, humiliation, emotional distress, loss of liberty, and violations of his constitutional rights, including his right to privacy, to liberty, to be left alone, to travel, and to be free from unreasonable searches.

171.    Mr. Howard is entitled to monetary relief, including nominal, compensatory, and punitive damages, and declaratory relief for this claim.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Talj Howard respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief:

A. A declaration that Defendants' conduct violated the Fourth and Fourteenth Amendments to the Constitution, Title VI of the Civil Rights Act of 1964, and Article I, Section 5 of the Louisiana Constitution;

B. Nominal, compensatory, and special damages;

C. Punitive damages under 42 U.S.C. § 1983;

D. Any and all equitable relief as deemed appropriate by this Court;

E. Attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

F. Any other relief this Court deems just and proper.


Respectfully submitted,


Dated: April 1, 2022                */s/Whitney M. Antoine*

**Barrasso Usdin Kupperman Freeman & Sarver, L.L.C.**
Whitney M. Antoine (SBN LA 38660)
909 Poydras Street, Suite 2350
New Orleans, LA 70112
Telephone: (504) 589-9737
wantoine@barrassousdin.com


*/s/Nora Ahmed*
**American Civil Liberties Union of Louisiana**
Nora Ahmed* (SBN NY 5092374)
1340 Poydras St., Ste. 2160
New Orleans, LA 70112
(504) 522-0682
nahmed@laaclu.org


*/s/ Cynthia Fernandez Lumermann*
**Wachtell, Lipton, Rosen & Katz**
Cynthia Fernandez Lumermann* (NY 5071618)
Stephanie A. Marshak* (NY 5493556)
Kiet T. Lam* (NY 5705678)
Anthony R. Raduazo* (NY 5695473)
Alexandra M. Ferrara* (NY 5772710)
51 W 52nd Street
New York, NY 10019
(212) 403-1000
CFernandez@wlrk.com
SAMarshak@wlrk.com
KTLam@wlrk.com
ARRaduazo@wlrk.com
AMFerrara@wlrk.com

*Counsel for Plaintiff Talj Howard*


*\*Pro hac vice forthcoming*